Her argument this morning is Monroe against the Indiana Department of Transportation. Mr. Ganser. Good morning, Your Honors, and may it please the court, I am Eric Hartz, and I represent Jeff Monroe in this appeal. He's the plaintiff appellant against the Indiana Department of Transportation for the court. We will refer to them as the state. We're appealing the district court's grant of summary judgment in favor of the state. We believe that Mr. Monroe has produced sufficient evidence from which a jury could find that he was fired not because of his performance but because of his actual or perceived disability. I guess our primary reason for the appeal is that we feel that the district court applied the standard of comparators too rigidly and inflexibly. We've seen many cases, particularly recently, where this court has said that it doesn't have to be an exact comparator or you don't need to find a clone, but to make a flexible and common sense analysis of proffered comparators. Mr. Monroe. Mr. Ganser, I just want to make sure I understand the scope of your appeal. Are you contesting the district court's disposition with respect to the claim for a reasonable accommodation? We are not, Your Honor. Okay, thank you. We've seen again and again that the comparators did not need to be exact. Mr. Monroe has proffered three comparators in this case, all of which who engaged in the same behavior but were treated differently. Now, the district court had made some distinctions on whether there was actual, the district court essentially found that there was similar behavior in all three cases but found different reasons to not exclude them. The first comparator we would point to actually held a slightly different position and was dismissed as a comparator because of how old his discipline was compared to Mr. Monroe's. That was Mr. Patrick, but he did have very similar transgressions, I suppose. He reported to the same supervisor. He was subject to the state personnel policy, which Mr. Monroe allegedly violated. Multiple employees complained about him and it was about the work environment that he created, a hostile work environment or an uncomfortable or intimidating environment. He was not disciplined. Weren't Wilson and Patrick just cause employees so they were under different standards whereas Monroe was an at-will employee? That's correct, Your Honor. And it is easier to terminate an at-will employee than a just cause? That's correct, Your Honor. The district court did seem to place substantial weight behind that changing of classification of employees that happened, I believe, first of July in 2011. We have some issues with that. The first issue I would say is that it's a distinction without a real practical world difference. They changed these employees from what they called non-merit employees to unclassified employees. The non-merit employees were under a just cause standard and had appeal rights at what they called the State Employees' Appeals Commission. The non-classified employees were at-will employees who served at the pleasure of the appointing authority and were at-will employees. However, they also had appeal rights at the State Employees' Appeals Commission, the same commission, if their termination or the So we feel that that's a distinction without a difference. Well, with respect to Patrick, there's no evidence that George was the decision-maker for the discipline in 2010, right? He was involved in the decisions to discipline Patrick, Wilson, and Branson. I believe the record does show that. And specifically, what was his role? As part of a decision-maker along with Mr. I'm not even sure if they're the same people back in 2007, but as part of the decision-maker in the discipline. With regard to the classification of employees, there's also nothing in the record to indicate that the decision-makers, while deciding this discipline or this decision on Mr. Monroe or any of the proffered comparators, there's nothing in the record to indicate that they considered the differences in the classification of employees, whether before the change or after the change. And even if that distinction that the district court made, Mr. Branson, the third comparator, his demotion would still also arguably be evidence of better treatment. The district court found that, in fact, did find that Mr. Branson was treated slightly more leniently or said, I believe to quote, one non-disabled employee treated slightly more leniently than Mr. Monroe was insufficient to defeat summary judgment. But Mr. Branson had the same... Well, he was demoted after there was a physical altercation with a co-worker, right? He was demoted in 2012 and then... No, I'm sorry. He was placed on suspension while in the same role as Mr. Monroe, who was terminated. He was placed on suspension in the fall of 2012. Mr. Monroe subsequently was terminated in February and Mr. Branson then in the same spring of 2013 was then demoted from his highway tech supervisor, which was the same position, down a slot, I believe, to a unit foreman. But you agree that Monroe's investigation revealed a pattern of verbal abuse and hostility confirmed by at least 11 employees, which is distinguishable from Branson. Well, Branson had, I think, because of the number of different complaints or incidents that he had, I think you can show consistency because there were separate events. With Mr. Monroe, no one knew, in a position of authority, no one knew that there was any sort of consistency in the complaints or the treatment of his subordinates. There was one incident on January 24th where afterwards the subordinates went to complain on the 25th. During the course of the investigation that ensued, they may have found out about some more incidents, but it's not clear from the record that there was, on this date something happened, on this date something happened. They said consistently, but there really is not any evidence in the record that he consistently did that. But isn't there a record, isn't there evidence in the record that Monroe's subordinates stated to Monroe's superiors that there was the consistent harassment and abuse? They did, but there's no record that's, that there's no record that says he did this on this day, he was short with us on this day, he threw us all out on this day, he was intimidating on this day. They said, essentially, he's gotten worse lately, not that there was any problems. And so bad that they all said they were going to quit, or something to that effect, right, if they had to continue under him? Well, the record does show that some of the investigations are mixed. There were comments by other subordinates that said, this crew has a way of blowing things out of proportion, that if Mr. Monroe raises his voice, it's because he wants them to get something done, that it's motivation, that he's one that knows how to get things done and is sometimes short with people. So there were mixed reports in that investigation that the employees. Right, and do any of the comparators have a situation where half of those comparator subordinates went to the comparator's superiors and threatened to quit en masse if they were forced to continue to work for the comparator? There's nothing in the record that indicates that they had threatened to quit, and I think, you know, that's an argument the state has put forward, and based on the facts that it was at the end of the same shift where the problem had occurred, I believe Mr. Monroe did go back, no one did actually follow through on that threat to leave employment if Mr. Monroe continued. Well, Mr. Monroe didn't continue because he was fired a week later, so they never had to make good on their threat. Isn't that right? That is right. Okay, did any of the comparators have a situation where the comparator subordinates complained to the comparator's superiors that the comparator had mocked a subordinate for having a disability? There's nothing in the record that indicates that, Your Honor. Doesn't that distinguish Mr. Monroe from his comparators? Well, I think when we look at the comparable seriousness standard, that is, and your point is well taken, that's a serious accusation of serious misconduct. When you look at Mr. Branson, though, a comparable seriousness, I think, is trying to initiate a fight with a subordinate, or it's not clear if it's a subordinate or co-worker at the side of a highway. In fact, when confronted with a comparable situation, Mr. Monroe de-escalated the physical situation. I think that both of them are serious accusations of misconduct, and I think that they are comparable in their seriousness, but I do think that you can look at initiating a fight on the side of the road as comparable in seriousness to allegedly mocking someone for not being able to hear. Right, and Wilson, there was no evidence he ridiculed an employee because of a hearing impairment or tried to start a fight. No, it was more general threatening behavior towards employees or intimidating behavior towards employees. The state has also argued that Mr. Monroe was not a qualified individual with a disability, and that he was not meeting expectations based on the events of January 24th. We do agree with District Court in that Mr. Monroe was a qualified individual with a disability. He did have the disability that limited him in a major life function, which was sleeping, and he had made overtures to his direct supervisor back in December, as well as again in January, that the lack of sleep was affecting him, that he was burnt out, that he would like to have had a day shift in hopes that he could get himself together. We believe that sufficient evidence was presented to the District Court that he was a qualified individual with a disability, and that the District Court decided that issue properly. Whether he was meeting expectations based on the January 24th incident was that, whether he was meeting expectations based on January 24th incident. He had just recently, I believe it was on January 7th, had his annual review, and it said he was exceeding expectations across the board. From an operations standpoint, there is no indication that he was not meeting expectations. Well, in that last performance evaluation, they also noted that he can sometimes become impatient and coarse when things don't go as planned, and this has caused misunderstandings with others at times. That was part of it. Yes, and he did exceed... So that might undermine your argument that he was meeting performance expectations at the time he was terminated. Well, I do believe that the overall evaluation said that he was exceeding expectations. I think those were notes on things he could potentially improve, but if he was exceeding, then at that point, you have to assume that these performance evaluations by supervisors mean that the supervisors are paying attention to what Mr. Monroe is doing, and that they do have an accurate sense of the situation, not just between Mr. Monroe and his supervisors, but the way that he's treating his subordinates as well. So to change course within a couple of weeks based on one evaluation, I think that would be a good thing to do. You're in the Eurobuttel time if you want to say anything. Oh, I'm sorry. I'll reserve the rest. Thank you. Thank you, Mr. Gansner. Mr. Conant. This is terrible. I'm sorry, Mr. Craft. I'm reading the wrong list. May it please the court. I'm Aaron Craft. I represent the Indiana Department of Transportation in this matter, and like Mr. Monroe's counsel, I'll refer to it as the state. The district court correctly determined here that no reasonable jury could find that Mr. Monroe was terminated because of, or solely because of, his alleged PTSD. At most, Monroe's evidence shows that he has PTSD, and that perhaps the state knew about it. It really doesn't have any evidence to show that the state's investigation, which was prompted by the January 24th incident, was pretextual, that it was a sham or a lie. Just to recount what happened in that investigation, 26 then current and former subordinates of Monroe were interviewed. This was prompted by the seven who originally complained. Of those 26, 80%, 21 of them, in some manner, described Monroe as being militaristic, aggressive, abusive, and somewhat of a loose cannon. Moreover, several of those interviewed described that this had been going on for months, if not longer. In addition to being verbally abusive and threatening all the employees with their jobs on occasion, that he made fun of one employee in particular for having a hearing impairment, and made fun of them for having such an impairment. This is conduct that no employer, not even a state, can tolerate within its ranks. Mr. Monroe tries to suggest that he was treated differently than his alleged comparators, but the comparators really aren't that similar in the material ways. We agree they don't have to be identical, but they do have to be similar in the material elements. Same supervisor, same standards of conduct, same type of conduct. Is it chronic versus acute? I'll just go through Mr. Patrick. There is no evidence in the record that Mr. George was Mr. Patrick's supervisor in 2009 or 2010 when Patrick was disciplined. What the record shows is that in his deposition in 2015, Mr. George was asked the general question, have you ever received complaints about Patrick? Some have said he's direct from time to time, but that was never connected back to the 2009 incident that Mr. Monroe testified about, and there's no documentation from about a 2009 or 2010 incident involving Patrick in Exhibit Q, which are the comparator's employees records. Mr. Wilson was disciplined before 2011, which is when the change went into effect, changing most state employees from just-cause employees to at-will employees, and so he doesn't provide a very apt comparator because it's just easier to fire an at-will employee than it is a just-cause employee. It's easier to take any measure of discipline against an at-will employee than it is for a just-cause employee. There's also no evidence that Mr. Wilson picked on a disabled subordinate or co-worker, and I'll also point out that when Mr. Wilson acted inappropriately in 2014 under the same standard, he, like Mr. Monroe, was given the option to resign and keep some vacation pay or be terminated. He chose to resign. Lastly, there's Jim Branson. Jim Branson was the only employee disciplined after the 2011 that was not terminated, at least among comparators, but his actions were two isolated incidents, one of which wasn't even against a subordinate. It was against a co-worker where he swore and threw down a squeegee. The second one, which caused his demotion, was a physical confrontation. Mr. Branson might be an apt comparator if all we had for Monroe's conduct was a January 24th incident in which he blew up at a meeting and wanted to goad an employee into a fistfight. Then that would be a comparator, but as I recounted earlier, the investigation showed a chronic pattern of abuse and threatening and picking on a disabled subordinate. Lastly, I just point out that Monroe's prior performance appraisals do not really suggest an inference of discrimination. They don't support it. His last appraisal was about a month before his termination, and although he received and exceeds expectations overall, he got meets and subordinates. Moreover, nothing that's in those positive appraisals overshadows the fact that the state conducted a thorough investigation and interviewed 26 people, and some of that came out. The information that came out of that undermined some of those appraisals. The positive appraisals are not some form of credit that he can dip into to justify his chronic misbehavior, and if there are no further questions, we ask that this Court affirm Judge Barker's decision. Thank you, Mr. Kraft. Anything further, Mr. Hartz? My apologies for misnaming you the last time. It's always dangerous to get the order of arguments mixed up. Thank you, Your Honors. With regard to the state's indication that the meets expectations with regard to dealing with employees or subordinates would indicate a need for improvement, I don't think that the term or the phrase meets expectations would indicate to any employee that that means that they need to improve. It may be for a high-achieving employee that thinks, oh, I only meet expectations, but I don't think that that shows any sort of negative inference for anyone to draw. The state has argued that perhaps the state knew about his disability, and that's all they really said about it, and I think that there's no dispute that the state was aware of his disability, that he had PTSD or at least believed he had PTSD, and they've testified that the decision makers have testified that they did not disbelieve him when he said that he felt he had PTSD and that it was a factor or was not a factor in their decision. My time is up. If there aren't any more questions. Thank you very much, Counsel. The case is taken under advisement.